IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| OSVALDO VALDEZ, | ) |
| Plaintiff, | ) ) ) |
| v. | ) Case No. 20 C 388 |
| CITY OF CHICAGO, EDDIE JOHNSON, and RAHM EMMANUEL, | ) Judge Joan H. Lefkow ) ) |
| Defendants. | ) ) |

**OPINION AND ORDER**

Former Police Superintendent Eddie Johnson and the City of Chicago now move for summary judgment under Federal Rule of Civil Procedure 56 on Osvaldo Valdez's claims that survived dismissal: First Amendment retaliation and Fourteenth Amendment discrimination claims brought under 42 U.S.C. § 1983 against Johnson, and derivative state-law indemnification claims brought under 745 Ill. Stat. Comp. 10/9-102 against the City. For the following reasons, the motion is granted.

**BACKGROUND**

On summary judgment, the court relies on the factual assertions and objections thereto contained in the parties' Local Rule 56.1 submissions, and it is entitled to strict compliance with Local Rule 56.1 procedures. *See Curtis* v. *Costco Wholesale Corp.*, 807 F.3d 215, 219 (7th Cir. 2015); *Stevo* v. *Frasor*, 662 F.3d 880, 886–87 (7th Cir. 2011). What follows are the relevant and properly supported factual assertions, based on the undisputed facts as admitted by the parties or, if an objection to an asserted fact was raised, based on the court's review of the underlying evidence cited in support of or opposition to the fact. *See Omnicare, Inc.* v. *UnitedHealth Grp., Inc.*, 629 F.3d 697, 704 (7th Cir. 2011). Thus, if a submitted fact is not included below, it is

because it either was immaterial and provided no helpful context or was unsupported by the evidence. Having evaluated both parties' factual assertions and supporting evidence, the court denies Valdez's request to strike Johnson's Local Rule 56.1 statement.

**I.  Valdez attended a meeting with high-ranking Chicago Police Department members to view dashcam video of Laquan McDonald's shooting.**

Valdez, who identifies as Latino, joined the Chicago Police Department (CPD) as a sworn officer in 1991. (DSOF ¶1.)[1] He became a lieutenant on January 16, 2008, and stayed at that rank through his resignation in January 2021. (DSOF ¶1.)

On October 20, 2014, on-duty CPD officer Jason Van Dyke shot and killed 16-year-old Laquan McDonald. (DSOF ¶7; PSOF ¶1.) This event gave rise to widespread publicity and discussion of whether the killing was justified. (*See* PSOF ¶58.) At that time, Valdez was a violent crimes lieutenant and had been trained on how to respond to police shootings (DSOF ¶21), and he was briefly on the scene after the McDonald shooting (PSOF ¶1). Later that month, several CPD officers, including then-deputy chief Johnson and Valdez, attended a meeting where they watched the dashcam video of the shooting and discussed whether it was justified. (PSOF ¶¶48, 50–51.)

**II.  Valdez advised superiors via email that in police-involved shootings, CPD should wait until investigations are complete or near complete before providing statements to the media.**

Months later, on February 20, 2015, CPD Commander Eugene Roy forwarded to Valdez an email from then-Interim Superintendent John Escalante requesting input on any police-involved shootings and whether there were any issues to address in the media. (Dkt. 146-42 at 3.)

---

[1] This decision cites plaintiff's LR56.1(b)(3) statement as "PSOF ¶_" and defendants' LR56.1(a)(2) statement as "DSOF ¶_." Responses or objections to an asserted fact are indicated with an additional "R," as in "RDSOF" or "RPSOAF."

Valdez responded to Roy, suggesting, as it related to police-involved shootings, that CPD should wait "until the investigation is completed or close to being completed" before giving statements to the media to prevent inaccurate reporting. (DSOF ¶24.) Valdez further explained that he found initial statements on police-involved shootings from the Fraternal Order of Police (FOP) to be inaccurate, and he stressed that "educating the public and forcing the media to report responsibly could help minimize community distrust and unrest." (Dkt. 146-42 at 2.) Roy forwarded Valdez's response to Escalante, with Valdez copied, calling his suggestions well founded. (*Id.*) Escalante concurred in the sentiment that FOP's statements following police-involved shootings were complicating CPD's efforts to provide accurate initial reports to the media. (*Id.* at 1; *see* DSOF ¶25.)

### III. The Office of the Inspector General interviewed Valdez about the CPD response to the McDonald shooting.

Also on February 20, 2015, Escalante asked the City's Office of the Inspector General (OIG) to investigate whether any CPD member "violated any CPD rules, policies or orders in connection with their response and/or handling" of CPD's investigation into McDonald's death. (DSOF ¶7; PSOF ¶53.) OIG proceeded to investigate the "misconduct and incompetence related to the October 20, 2014 shooting[.]" (DSOF ¶10.)

The following year, on April 13, 2016, Johnson became the CPD superintendent. (DSOF ¶3.) A few months later, on June 6, 2016, OIG, as part of its ongoing investigation, served Valdez with a notice of allegations. (DSOF ¶8; PSOF ¶54.) In the notification, Valdez was accused of failing to appropriately supervise fellow officers, directing officers to complete false reports, failing to conduct and supervise a complete investigation, and incompetently performing his job duties regarding a police-related shooting incident. (DSOF ¶8.)

3

Following this notice, Valdez did not voluntarily provide information to OIG. (DSOF ¶9.) On July 12, 2016, Valdez was compelled to testify to OIG regarding the "misconduct and incompetence related to the October 20, 2014 shooting." (DSOF ¶10.) Valdez was required to cooperate with the OIG investigation as part of his duties and obligations as a City employee, and Valdez was advised that none of his statements could be construed as an official report. (DSOF ¶11.) A superior officer also ordered Valdez to answer OIG's questions. (DSOF ¶12; PSOF ¶55.) Indeed, not cooperating could have resulted in discipline or termination. (DSOF ¶13.) Valdez was represented by an attorney at the interview. (DSOF ¶¶15, 16.) Through his attorney, Valdez objected to the sharing or disclosure of the interview with anyone, including any government agency or the media. (DSOF ¶¶15, 16.)

During the interview, Valdez told investigators that he had attended a meeting with high-ranking CPD officials, including Johnson, a few weeks after McDonald's death, where they had watched a dashcam video of the incident. (DSOF ¶¶17, 19; PSOF ¶57.) He also told OIG that, in his opinion, McDonald was a threat to the officer, that the officer followed his training, and that all at the meeting agreed that the officer had used the force necessary to eliminate the threat. (DSOF ¶¶18, 19; PSOF ¶57.) Valdez then declined to opine on whether CPD's use-of-force training was appropriate, calling it "above [his] pay grade." (DSOF ¶20.) OIG ultimately did not find that Valdez violated any law, rule, or regulation. (PSOF ¶56.)

**IV.     Valdez's OIG interview statements were published by the Chicago Tribune and Johnson denies that he ever found the McDonald shooting to be justified.**

The Chicago Tribune obtained a copy of the transcript of Valdez's OIG interview and on December 23, 2016, it published an article that included his statements. (DSOF ¶28; PSOF ¶58.) The Tribune sought Johnson's comment on Valdez's statement that Johnson had been at the October 2014 meeting and had agreed that the shooting was justified. (DSOF ¶28; PSOF ¶58).

4

Johnson, through his press liaison, strongly disagreed with Valdez's characterizations that Johnson agreed that the shooting of McDonald was justified. (DSOF ¶28; PSOF ¶58.) Johnson also did not recall being at the October 2014 meeting, but he remembered that Valdez showed him the video a few weeks later. (DSOF ¶29; dkt. 146-8 at 34, tr. 154:6–15.)

V. **Johnson made promotional decisions according to established protocols during his tenure as superintendent.**

Johnson's promotion decisions for captain and commander followed certain protocols, detailed below. During his tenure, Johnson had discussions with City Council members about hiring minorities and he believed that CPD was "doing a fairly good job of ensuring diversity in command staff rank." (PSOF ¶59.) Overall, Johnson promoted five Latino/a CPD employees in 2019, including one to captain, two to commander, one to deputy chief, and one to chief. (DSOF ¶¶73, 74.) Valdez never heard Johnson make derogatory comments about Latinos, nor was he ever told that Johnson used derogatory terms for Latinos. (DSOF ¶75.)

A. **Promotions to captain**

Captains are executive officers in CPD. (DSOF ¶32.) They most commonly work in patrol districts as a second-in-command to the district commander, assisting in operations, administration, forming crime reduction strategies, and long-term planning. (DSOF ¶32.)

To be considered for promotion to captain, CPD lieutenants who are interested in promotion need to apply to be included on an eligibility list. (DSOF ¶33.) The superintendent creates captain promotion eligibility lists approximately every few years (PSOF ¶¶24, 25) by first posting an invitation for interested lieutenants to apply (DSOF ¶33). Candidates who meet the minimum qualifications for promotion have their applications forwarded to the Senior Executive Service Merit Board (Merit Board) to be reviewed and rated as either "highly

5

recommended" or "recommended" by each of its five members. (DSOF ¶¶34, 35.) The superintendent appoints the members of the Merit Board. (PSOF ¶26.)

Eligibility for promotion to captain also required selection for and completion of a pre-service captain's training. (DSOF ¶37.) In 2019, Johnson had the authority to select individuals for this training. (DSOF ¶37.)

No individual can be promoted to captain unless there is a budgeted position available. (DSOF ¶33.) In 2019, Johnson's practice was to allow district commanders who had a vacant captain position to choose an individual from the eligibility list who also had completed the captain's training. (DSOF ¶40.) According to Johnson, although he had the authority to approve or deny a commander's choice for captain, he never denied a commander's choice for captain, and he deferred to their selections because the district commanders and captains were required to work together. (DSOF ¶41.)

In late 2018, 167 lieutenants' applications for promotion to captain were submitted to the Merit Board and 9 of those applications were eliminated from further consideration for missing required documentation, leaving 158 applicants for review. (DSOF ¶35.) By early 2019, the Merit Board issued a memorandum with its assessments of the candidates. (DSOF ¶35.) Among those evaluated was Valdez, who received three highly recommended votes and two recommended votes. (DSOF ¶36.) Valdez had been on the eligibility list in 2015 and 2017; he received five "highly recommended" ratings in 2017. (PSOF ¶¶25, 27.) In 2019, no commander selected Valdez as his preferred candidate for a captain vacancy; Johnson also never instructed any commander that he could not select Valdez as a captain. (DSOF ¶42.)

In April 2019, Johnson selected Valdez to attend captain's training. (DSOF ¶38; PSOF ¶38.) During the training, on May 8, 2019, Johnson gave a speech to the attendees, in which he

6

"stated that he had to promote blacks, females, and gays." (DSOF ¶50; PSOF ¶38.) Johnson also mentioned the controversial police-involved shootings of McDonald and Paul O'Neal, who had been shot in July 2016, and "indicated that he hoped we understood that he said what he had to say about [them] so he could help avoid riots. He asked the class if [they] knew why Chicago did not experience riots during the recent controversial incidents and he followed up by saying it was because of relationships. He stated that the relationships he was referring to were those with the community leadership and activists." (DSOF ¶¶51, 52, 54.) Valdez suspected that Johnson's statements about police-involved shootings were directed at him because he believed that he was the only lieutenant in the class who had investigated police-involved shootings and was on the scenes of both the McDonald and O'Neal shootings. (DSOF ¶55.) And Valdez suspected that Johnson's comment that "he hoped [the candidates] understood that he said what he had to say about [the McDonald shooting] so he could help avoid riots" was in reference to his OIG statements, and the implication that he took from Johnson's statement was that Valdez's OIG statements had undermined his relationships with the community and political leaders and they contributed to public anger. (DSOF ¶56; see RDSOF ¶56.)

Of the 19 lieutenants who completed the captain's training in 2019, 10 were promoted to captain in that year. (DSOF ¶39). All 10 who were promoted had attended captain's training in 2019 and were selected by their district commanders. (DSOF ¶42.) Valdez knew all 10 individuals who were promoted, but he did not know their qualifications or the comparative strength of their applications. (DSOF ¶¶43, 44). And despite not being selected for a promotion, Valdez and the other candidates who were not selected remained eligible for future promotion. (DSOF ¶¶45, 47, 48, 49.) Johnson claimed that he never saw the actual transcript from Valdez's OIG interview and did not consider those statements in his promotion decisions. (DSOF ¶31.)

7

### B. Promotions to commander

For commander positions, Johnson similarly had discretion to appoint any sworn CPD member to the position. (DSOF ¶61.) His usual practice, however, was to promote captains or lieutenants who had already applied for captain and been reviewed by the Merit Board. (DSOF ¶61.)

A commander position was first created through the City's budget process. (DSOF ¶62.) Once in existence and vacant, Johnson would convene a small group of high-ranking individuals to discuss qualified candidates. (DSOF ¶63.) In 2019, Johnson promoted 12 CPD members to commander. (DSOF ¶64). Johnson believed that the individuals he promoted in 2019 were better qualified than Valdez. (DSOF ¶64.)

Despite Valdez's not being promoted from lieutenant to commander in 2019, in July of that year, Johnson allowed Valdez to serve as acting commander of Area Central of the Detective's Bureau. (DSOF ¶67.) The permanent commander had been temporarily reassigned during a disciplinary investigation, which remained ongoing through Johnson's tenure as superintendent in December 2019 and Valdez's retirement in January 2021. (DSOF ¶67.) Although Johnson could have removed the permanent commander to create a vacancy, he did not do so. (DSOF ¶70; RDSOF ¶68.) Johnson made no permanent commander appointments in the Detective Division Areas in 2019, where Valdez worked, nor were there any vacancies. (DSOF ¶¶69, 70.)

### LEGAL STANDARD

Summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The court views all facts in the light most favorable to the nonmovant and draws all

8

reasonable inferences in his favor. *See Matsushita Elec. Indus. Co.* v. *Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

The movant must show that there is no genuine dispute of fact preventing the entry of judgment in his favor as a matter of law. *See Celotex Corp.* v. *Catrett*, 477 U.S. 317, 323 (1986). To avoid summary judgment, the non-movant must do more than raise "some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co.*, 475 U.S. at 586. Rather, he "must present affirmative evidence in order to defeat a properly supported motion for summary judgment." *Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242, 257 (1986). To create a genuine dispute, the evidence must be "such that a reasonable jury could return a verdict for the [non-movant]." *Id.* at 248.

## ANALYSIS

Both the retaliation and discrimination claims stem from the fact that Valdez was not promoted to captain or commander during Johnson's tenure as superintendent. The factual predicate for each claim, however, is different. For the retaliation claim, Valdez believes that he was not promoted because of his 2016 OIG interview statements, which suggested that Johnson believed that the McDonald shooting was justified and CPD use-of-force training was deficient, and his 2015 emails on CPD media responses on police-involved shootings, which he believes were contrary to CPD policy. For the discrimination claim, Valdez believes that Johnson did not promote him because Johnson intentionally discriminated against his ethnicity, which is Latino. Although these claims have different elements, at root both come down to whether the evidence would permit a reasonable jury to conclude that Valdez's speech or ethnicity influenced Johnson to not promote him to a particular captain or commander vacancy. *See, e.g.*, *Sweet* v. *Town of Bargersville*, 18 F.4th 273, 279 (7th Cir. 2021) (First Amendment retaliation); *LaRiviere* v. *Bd.*

9

*of Trs. of S. Ill. Univ.*, 926 F.3d 356, 359 (7th Cir. 2019) (Title VII discrimination and retaliation claims); *Reed* v. *Freedom Mortg. Corp.*, 869 F.3d 543, 547–48 (7th Cir. 2017) (state-law race discrimination claim).

As explained below, there is insufficient evidence on which a reasonable jury could conclude that Johnson did not promote Valdez as retaliation for his speech or because he is Latino. Johnson is therefore entitled to summary judgment on the § 1983 claims. Given the outcome on the merits of the adverse-action and causation elements of the retaliation claim, the court declines to consider whether Johnson is entitled to qualified immunity on the basis that the law governing whether the alleged speech at issue was not clearly established. The City also is entitled to summary judgment on the state-law indemnification claims because they are derivative of the § 1983 claims against Johnson. *See Wilson* v. *City of Chi.*, 120 F.3d 681, 685 (7th Cir. 1997); *Anderson* v. *Moussa*, 250 F. Supp. 3d 344, 347 (N.D. Ill. 2017).

I. **There is insufficient evidence for a reasonable jury to conclude that Johnson chose not to promote Valdez in retaliation for Valdez's speech.**

To survive summary judgment on the First Amendment retaliation claim, Valdez must show that there is sufficient evidence on which a reasonable jury could find that he engaged in protected speech, he suffered an adverse action, and his protected speech motivated the adverse action. *See Santana* v. *Cook Cty. Bd. of Rev.*, 679 F.3d 614, 622 (7th Cir. 2012).

As to the first element, the court is skeptical that Valdez's OIG interview statements or work emails wholly or partly contain constitutionally protected speech, but for purposes of this decision the court will assume that they are, *e.g.*, *Sweet*, 18 F.4th at 278, because the claim definitively fails on the latter two elements.

Regarding adverse action, Valdez fails to identify a specific vacancy for which he was passed over for some retaliatory reason. Valdez admits that the only alleged openings that he was

10

eligible for and did not get, while Johnson was superintendent from April 2016 through December 2019, were in June and October of 2019. (DSOF ¶2.) The evidence shows that commander and captain promotions were tied to specific vacancies (DSOF ¶¶33, 62, 64) and there were indeed vacancies for both positions that were filled in 2019 (DSOF ¶¶12, 43). Yet Valdez fails to offer any details about the particular vacancy openings that he was denied, such as whether they were captain or commander positions, in what districts, and the candidates who got the jobs over him. *E.g.*, *Hudson* v. *Chi. Transit Auth.*, 375 F.3d 552, 558 (7th Cir. 2004) (a job vacancy is a predicate for claim based on failure to promote). Moreover, even if Johnson could create vacancies and fill them, as Valdez suggests for at least the commander positions (*see* RDSOF ¶68; PSOF ¶21), the failure to exercise discretion to create a vacancy is not an adverse action. *E.g.*, *Hottenroth* v. *Vill. of Slinger*, 388 F.3d 1015, 1032 (7th Cir. 2004) (employer's failure to create a new position for employee is not, as a matter of law, adverse action). Thus, this retaliation claim fails on the independent basis that Valdez has not supplied sufficient evidence of any specific existing vacancies for which he was not selected.

Even if one assumes that Valdez had identified the specific vacancies, the evidence does not support the inference that Johnson was motivated in part to not promote him because of his 2015 emails or 2016 OIG interview statements. There is no direct evidence of retaliatory motive here, but circumstantial evidence may carry the day on summary judgment if it is sufficient for a reasonable jury to find a retaliatory motive. *See Sweet*, 18 F.4th at 279. Such evidence can include a host of various data points, including suspicious timing between the protected activity and adverse action, and a defendant's words and deeds. *Id*. But no evidence here establishes a connection between the failure to promote and either the 2015 emails or 2016 OIG interview statements.

As to the 2015 emails, there is no evidence showing that Johnson knew of them. Valdez acknowledges this by attempting to impute the email recipients' knowledge (Escalante's and Roy's) to Johnson through the general principle of agency law that knowledge that a corporate agent receives will be imputed to the corporation itself. (*See* dkt. 143 at 36, citing PSOF ¶52, which merely describes the emails, and *Campen* v. *Exec. House Hotel, Inc.*, 434 N.E.2d 511, 517 (1982), a decision that affirmed a trial court finding that a corporation had knowledge of a fact based on what its agents knew.) Corporate agency principles cannot, as matter of law, make up for the lack of evidence supporting even an inference that Johnson was aware of Valdez's email conversation with Escalante and Roy. This § 1983 claim "requires personal involvement in the alleged constitutional deprivation," *Colbert* v. *City of Chi.*, 851 F.3d 649, 657 (7th Cir. 2017), and Johnson cannot have retaliated against Valdez for speech he did not know about.

That leaves the 2016 OIG interview statements. Johnson was aware of these statements, unlike the emails, because the Tribune asked for his comment on them. But Johnson points to several facts that undermine the inference that he harbored a retaliatory motive because of these statements. The captain's promotion process considered Merit Board ratings and, crucially, selection by the district commander under whom the captain candidate would work. Valdez was not selected by any commander for promotion to a captain vacancy. Valdez also does not know how he ranked against those other candidates, all of whom had been selected by commanders.

Against this, Valdez has no evidence supporting a reasonable inference that his 2016 OIG interview statements stuck in Johnson's craw through 2019. Valdez suspects that Johnson harbored ill will toward him because Valdez's OIG interview statement, published by the Tribune, suggested that Johnson believed that the McDonald shooting was justified, and Johnson was then forced to comment publicly to correct this. But Valdez's suspicion that Johnson was

directing criticism of his 2016 OIG interview statements through comments Johnson made at the May 8, 2019 captain's training is insufficient. Those comments were vague and gave no contextual clues as to what specific comments Johnson made about the McDonald or O'Neal shootings. Valdez's belief that the comments were directed at him and evinced Johnson's annoyance with his OIG interview statements is entirely speculative.

Moreover, there is a significant time gap between the December 2016 publication of Valdez's OIG interview statements and the alleged failure to promote in June or October 2019. The passage of time naturally undermines the strength of an inference of causal connection, and cases have found that even a few months is too long of a gap to infer a causal link between a protected activity and adverse action. *See Sweet*, 18 F.4th at 279 (five-month gap between protected activity and adverse action "far too distant"). The gap here is two-and-a-half years, rendering any inference that Johnson acted in 2019 in retaliation for Valdez's 2016 speech, without any other supporting evidence, not reasonable.

Valdez argues, however, that he can, essentially, reach back to 2015, when he first became eligible for promotion (even though he had not completed the mandatory captain's training until April 2019), the same year of his emails, and count each year that he did not receive a promotion as an accumulating or tolling adverse action, thereby keeping those past events relevant through 2019. He circularly argues that "the events are so closely related that they likely are related." Not only is there no evidentiary support or authority for that theory, but it also fails to describe an adverse action.

On his comparative qualification for captain, Valdez claims that first deputy to superintendent Anthony Riccio and senior commander Brendan Deenihan confirmed that he "was the most qualified for promotion to captain or commander." (Dkt. 143 at 34 (citing PSOF

13

¶¶29, 30).) But the evidence does not support this argument. No evidence or even factual assertion states that Riccio believed that Valdez was the most qualified, and Deenihan only stated that he was not "aware of anyone who was promoted to commander who, in [his] opinion, was not as qualified as … Valdez[.]" (Dkt. 146-12 at 21, tr. 78:20–24).) Valdez was not unqualified for captain, but no evidence establishes that he was objectively more qualified than any other candidate, such that it raises suspicions as to why he was not selected. *Cf. Nichols* v. *S. Ill. Univ.-Edwardsville*, 510 F.3d 772, 784 (7th Cir. 2007) (failure to promote claim failed because there was no evidence plaintiffs "were equally or more qualified than" employees who were promoted). Specifically, there is no evidence showing that the difference between Valdez's non-promotion and some other candidate's promotion might be explained by retaliatory motive.

Valdez also questions whether Johnson truly relied on others' input in his promotional decisions for captain because he "did not heed the written recommendations for [him]" from Riccio, Roy, or Deenihan, and because a former chief of detectives, Melissa Staples, could not recall being asked by Johnson to help him evaluate captain candidates. (Dkt. 143 at 35 (citing PSOF ¶28).) That Valdez did not receive a promotion does not establish or support the reasonable inference that Johnson did not "heed," *i.e.*, notice, those recommendations. It is equally speculative to assume that Johnson read the recommendations yet did not promote Valdez for some other reason. Further, Johnson's awareness of the recommendations does not establish that Valdez should have been selected for a vacancy, for it says nothing about how Valdez stacked up against other candidates, all of whom were selected by commanders to serve as their captains.

Last, Valdez attempts to recast Johnson's selection of Valdez for the 2019 captain's training as a negative, because he claims that it necessarily means that Johnson wrongly refused

to select him for the training in prior years and because he did not become a captain after the training. No evidence suggests any malicious intent underlying this action. Out of the 158 lieutenants who were reviewed by the Merit Board for captain, Valdez was one of only 19 lieutenants selected. Two months later after the training, Johnson selected Valdez to serve as an acting commander, a step above captain. This evidence does not suggest that Johnson was thwarting Valdez's career.

In conclusion, Valdez has failed to present evidence sufficient to create a genuine issue of material fact. His evidence of retaliation is almost entirely his own suspicions about what Johnson thought of his 2015 emails and his 2016 OIG interview statements. He has no witness or documentary evidence that supports these suspicions. No reasonable jury would find Valdez's evidence sufficient to conclude that Johnson did not promote him to a specific vacancy or did not promote him to a vacancy in 2019 because of his assumed-to-be-protected speech. Summary judgment for Johnson is appropriate.

**II.    There is insufficient evidence for a reasonable jury to conclude that Johnson did not promote Valdez because of his ethnicity.**

The Equal Protection Clause of the Fourteenth Amendment prohibits intentional discrimination based on, among other things, ethnicity, as Valdez charges here. *See Lisle* v. *Welborn*, 933 F.3d 705, 719–20 (7th Cir. 2019) (citing *Ortiz* v. *Werner Enters., Inc.*, 834 F.3d 760 (7th Cir. 2016)); *David K.* v. *Lane*, 839 F.2d 1265, 1271–72 (7th Cir. 1988). The question here is whether there is sufficient evidence for a reasonable jury to conclude that Valdez would have been promoted to captain or commander if he had a different ethnicity, and all else remained the same. *See LaRiviere* v. *Bd. of Trs. of S. Ill. Univ.*, 926 F.3d 356, 359 (7th Cir. 2019) (quoting *Ortiz*, 834 F.3d at 764–65).

15

As with the retaliation claim, the lack of any specific vacancy on which Valdez lost out defeats this claim. Assuming that there was an adverse action, the court finds insufficient evidence supporting an inference of discriminatory motive for non-promotion. On Johnson's side, there is the fact that he furthered Valdez's career by selecting him as one of just 19 lieutenants selected from the 158 applicants who were rated by the Merit Board to attend the captain's training in April 2019. (DSOF ¶38.) Further, Johnson claims that he did not select Valdez for an open captain vacancy because no commander selected him for a captain position in his district. (DSOF ¶42.) Johnson also points to his record of elevating five Latino/a individuals to high-ranking positions in 2019. (DSOF ¶73.) This evidence all suggests that no promotional decision was infected by a discriminatory motive.

Valdez, in response, points to several pieces of evidence that he claims support the reasonable inference that Johnson failed to promote him because of his ethnicity. First, Valdez relies on certain promotion and hiring practice requirements that are contained in the consent decree in *Illinois* v. *City of Chicago*, No. 17 C 6260 (N.D. Ill. Jan. 31, 2019), as providing "crucial context" for his claim. If Valdez means that the consent decree is evidence of past discriminatory employment practices, he takes it too far. The consent decree does not suggest that Johnson (or any superintendent) harbored discriminatory animus against Latinos, let alone specifically did not promote Valdez to a captain or commander position because of his ethnicity.

Next, Valdez points to remarks that Johnson made at the 2019 captain's training and to City Council members. Johnson "stated that he had to promote blacks, females, and gays." (PSOF at ¶38; *see* DSOF at ¶50.) Johnson also had conversations with City Council members regarding minority hiring (the details of which Valdez does not provide) and Johnson believed that CPD was "doing a fairly good job of ensuring diversity in command staff rank." (PSOF

16

¶59.) None of this supports any inference of discrimination. The closest that Valdez gets is the statement about promoting "blacks, females, and gays," but without more context and factual support, and in light of the actual promotion of other Latinos, the inference that Johnson meant to exclude Latinos or other protected classes from promotion is speculation.

Thus, Valdez has produced insufficient evidence for a reasonable jury to find that Johnson did not promote him due to his ethnicity. Johnson is entitled to summary judgment on this claim.

## CONCLUSION AND ORDER

Defendants' motion for summary judgment (dkt. 121) is granted. This order and the prior order on defendants' motion to dismiss (dkt. 39) resolve all claims against all parties. The Clerk is directed to enter judgment under Rule 58. Case terminated.

Date: September 27, 2022

_____
U.S. District Judge Joan H. Lefkow